William F. BRUNS and Lottie M. Bruns, his wife (Plaintiffs), Respondents,

v.

A. L. UEBEL et al. (Defendants),

Steve LaJeunesse (Intervenor), Appellant.

No. 46350.

Supreme Court of Missouri, Division No. 1.

Nov. 10, 1958.

Motion for Rehearing or to Transfer to Court en Banc Denied Dec. 8, 1958.

Adolph G. Schumacher, Clayton, for appellant.

Rader, Love & Falzone, Clayton, for plaintiffs (respondents).

DALTON, Judge.

Action to quiet and determine title to thirteen particularly described lots in Burke City Subdivision in St. Louis County, wherein intervenor was permitted to intervene and file a petition claiming title. No grounds for affirmative equitable relief were stated in either petition. The cause was tried to the court without the aid of a jury and the issues found for plaintiffs on plaintiffs' petition and against all defendants and for plaintiffs and against intervenor on intervenor's petition. Intervenor has appealed.

Plaintiffs and intervenor claim title through a common source, five lots through one deed and eight through another, both being Third Sale Collector's Deeds in tax sales executed by the Collector of the City of Berkeley, St. Louis County. The deeds were made as a result of third offerings in foreclosure of city tax liens under the Jones-Munger Law as applied to cities of the fourth class. Both deeds are dated August 23, 1948. One was recorded December 14, 1948 and the other February 9, 1949. The deeds are in regular form and it is conceded that title passed to Steve LaJeunesse, the intervenor herein, the grantee named in the respective deeds. Plaintiffs claim record title under and through the grantee in a quit claim deed alleged to have been executed by intervenor and his wife purporting to convey title to this and other property. The said quit claim deed, regular in form is dated January 21, 1952 and it was duly recorded.

In his petition, intervenor alleged the execution of the Collector's deeds to him and that he had "not knowingly conveyed or transferred any right, title or interest to anyone in and to the aforesaid real estate and had at no time received any consideration whatsoever from anyone for any such transfer of title or interest." He asked to be declared the fee simple owner of the described real estate. The intervening petition makes no specific attack upon the quit claim deed in question through which, by mesne conveyances, plaintiffs claim title. Intervenor did move to strike a portion of plaintiffs' answer to the intervening petition wherein plaintiffs alleged that intervenor "claiming no interest in said lots, executed a quit claim deed to one Vernette A. Glaser, dated January 22, 1952 and * * * that the plaintiffs had thereafter acquired title to the real estate" by subsequent conveyances. The motion was overruled.

Plaintiffs' evidence tended to show that, prior to August 1948, there were a large number of lots in the City of Berkeley on which city taxes had never been paid; that there was a considerable amount of expense in advertising these lots, year after year, in an effort to foreclose the tax liens; that when offered the city obtained no bids of sufficient amount to pay the taxes; that the then city attorney advised the mayor that the city could appoint an agent or trustee to bid on behalf of the city and bid in the lots for the amount of the taxes when offered the third time, where there were no such bids by third parties; and, if the former owners wanted to redeem the lots, the city could accept the amount of the taxes, interest, penalties and cost and give such owner a quit claim deed. Thereafter, the mayor appointed intervenor, as agent or trustee for the city, to purchase such lots as were offered the third time, if no third party was willing to bid the amount of taxes due. The procedure was fully discussed between intervenor and the mayor and the city attorney. Intervenor at that time was building inspector for said city. The city itself was not interested in acquiring title to the lots. The purpose was explained to intervenor, to wit, that the lots would be released to the owners, if the owners wanted to redeem and would pay the taxes, interest, penalties and costs.

In August 1948, Mrs. Dorothy Wilson was city clerk and collector of the City of Berkeley and handled the collection of delinquent taxes. At the August 1948 tax sales, one Al Larsen acted as auctioneer, and made the statement before the sales began, that intervenor was present on behalf of the city and would bid on all lots offered for the third time where there were no bidders who would bid the amount of taxes due. A list was made of the lots that were bid in by intervenor at Mrs. Wilson's direction, where there were no other bidders. After the sales were concluded Mrs. Wilson, on September 15, 1948, figured the amount of taxes due on the lots bought in by intervenor at her direction and the total sum amounted to $3,903.96. The city's check for this amount was issued to intervenor. Mrs. Wilson presented it to him and had him endorse the check in blank and return it to her and she deposited it to the city's account. The city collector received no other money or consideration from intervenor. Collector's deeds, in accordance with the sales, were made to intervenor, but the deeds were recorded and retained by the city. Among these deeds were the two collector's deeds conveying the lots in question here.

In 1952, the record owners of the lots in question not having offered to redeem them, the city obtained an offer from an agent of one Glaser for all unredeemed lots at $15 each. The offer was presented to the Board of Aldermen of the city and the offer accepted. The money was paid to the city collector and a deed was prepared by Mrs. Wilson, the city clerk, and duly signed by intervenor and his wife in favor of Mrs. Glaser, who was designated as the grantee by the purchaser. Mrs. Wilson did not have an independent recollection of intervenor and his wife appearing at the city hall to sign this particular quit claim deed.

Intervenor and his wife had previously executed many quit claim deeds to other lots which had been redeemed by the owners or sold by the city, lots that had been bid in for the city at tax sales. The various quit claim deeds were prepared by Mrs. Wilson and filled in before they were signed by intervenor and his wife. Such deeds were filled in and signed only as lots were redeemed by their former owners or were sold by the city. According to Mrs. Wilson, the city at no time had an intention of becoming the owner by virtue of the collector's deeds, all the city was doing was to try to protect its tax liens. The quit claim deed to Mrs. Glaser was not signed in blank but was fully filled in before intervenor and his wife signed and acknowledged the deed. In some redemption cases, blank deeds may have been signed by intervenor and his wife, but in each case intervenor knew to whom the deeds

were to be made and who was redeeming the property.

The purchaser to whom the remaining unredeemed lots were sold by the City of Berkeley for $15 each resold them for $20 each. These lots were 25 feet wide, and approximately 125 feet in depth and in 1952 they were vacant. In 1952 they were assessed at $40 each and in 1956 they were assessed at $60 each. Their value on May 1, 1957 was $250 each and their actual value in 1952 was approximately $38 each. In purchasing the lots, Glaser dealt only with the city clerk and had no contact with intervenor.

The testimony of intervenor, testifying in his own behalf, tended to show that in 1948 he was building commissioner for the City of Berkeley and that he was paid on a commission basis for permits issued. Intervenor admitted the correctness of his and his wife's signatures on the quit claim deed by which the lots were transferred at the direction of the city to Mrs. Glaser as grantee at the direction of the purchaser, but he said the deed was not filled out at that time; that it was signed in blank and there were no revenue stamps attached to it, nor were the stamps cancelled; that he had previously signed quite a few quit claim deeds in blank; that the deeds were usually brought to him for signature by some policeman of the City of Berkeley; and that, when he signed the particular quit claim deed in blank, he did not know it would be filled out for 48 unredeemed lots or that Mrs. Glaser would be named as grantee. He said that, prior to the August 1948 tax sales and prior to the execution of the two collector's deeds to intervenor, questioned here, he had had a conversation with Mrs. Dorothy Wilson, city clerk and collector of the City of Berkeley about buying in lots at the tax sales, where no other purchasers bid the amount of taxes due; that she asked him to buy them in; that she did not say anything about money at that time; that she, subsequently, made a city check to him for $3,903.96, dated September 15, 1948; that the check was signed by Roy Heitman, city treasurer; and she asked him (intervenor) to endorse that check. After he endorsed the check, she took it back and he didn't know whether it was a loan from her or not; that he didn't in fact know it was a city check at the time he endorsed it; that he didn't know who appointed him building commissioner; that he only knew that Mrs. Wilson had called him and told him that he had been appointed, and he thereafter collected fees as such building commissioner, and kept the fees; that he held the office for two years; that he was familiar with some of the 13 lots in Burke City Subdivision in question here and their average value in 1957 was about $500 each; that he didn't know what these lots were worth in 1952, but they were worth more than $20 a lot; that he did not know what they were assessed at at any time; that he was paid nothing for signing the quit claim deed that had been made to Mrs. Glaser; that he was not paid anything for signing this or other quit claim deeds, which he signed in blank; and that he was never offered any payment for signing any of these quit claim deeds. He did not obtain the possession of the two collector's deeds in question which were dated August 23, 1948, until his attorney called for and obtained them from Mrs. Wilson after the institution of this suit. He testified that, in his conversation with Mrs. Wilson, with reference to buying in lots at tax sales, he was to make deeds when the lots were redeemed; that he was supposed to sign these quit claim deeds only when the former owner wanted to redeem them and pay the city the amount of taxes, interest, penalties and costs; and that, at the date of the Glaser deed, he did not know that Mrs. Wilson was releasing the lots otherwise to third parties.

Intervenor further testified that he did not pay anything for these lots at the time he bid at the city collector's sales in August 1948; that if he paid anything afterwards he didn't know how much it was; that no payments were ever paid to him when other

lots were redeemed and quit claim deeds made; that he never talked to the city attorney about being supposed to act as trustee in buying lots for the city; that he and Mrs. Wilson were both present at the 1948 tax sales in question; that the cancellation of the revenue stamps on the quit claim deed to Mrs. Glaser was not in his handwriting; that, when he signed the blank form quit claim deed, which was used in this case, he had no intention of conveying the 48 lots to Vernette Glaser.

On cross-examination he testified that it was customary after his purchases at these tax sales for a city policeman to bring him blank forms for quit claim deeds; that the policeman would say Mrs. Wilson sent them; that he and his wife would then voluntarily sign the blank deeds; that he did not ask for any money or make any demands on the officer; that no threats or force was used; that the officer would merely hand him the deed form and that he and his wife would sign it and give it back; that he had no recollection of attending any meeting where he was appointed deputy for the city to appear at any tax sales; that he went to the tax sale because Mrs. Wilson asked him to come down; that she was the only one that asked him to bid in the lots; that she didn't say for him to bid them in for the city, but just asked him to buy them in; and that in order to bid he merely made a motion to the auctioneer that he would take the lots in accordance with a pre-arranged signal to Mr. Larsen, the auctioneer; that the arrangement was between himself, the city clerk Mrs. Wilson and Mr. Larsen; that he gave the signal when there were no other bids, when no one would bid the amount the city had in the lots; that "there was an understanding with them that I just give them a nod that I take the lots when there was no bidders on them"; that he bid in quite a few lots "lots of times"; and that Mrs. Wilson told him when to bid. He only bid when Mrs. Wilson gave him a signal and he would then signal the auctioneer. Mrs. Wilson told him, "She would pay for them." He didn't know what she was doing, whether she was lending him the money or not. There was no question about interest between him and Mrs. Wilson. He didn't know whether the $3,900 check was a loan or not. She handed him the check and he endorsed it. He didn't look at the amount. He didn't have any idea what it was or whether it had anything to do with the tax sale. She just told him that she wanted him to endorse the check. He didn't pay any attention to it. He signed his name on the check and Mrs. Wilson kept it. He never gave Mrs. Wilson or the City of Berkeley anything at all at this August 1948 tax sale, no cash and no consideration whatever. He said he would buy at the tax sale, but didn't know whether it was for himself or not. "I was bidding for Mrs. Wilson, I guess she was working for the city." When the deeds were sent to him to be signed, he knew that he had never paid anything for the lots and he signed the quit claim deeds because "he thought they was supposed to be released * * * redeemed;" that he and his wife signed each deed that was brought to him from 1948 to 1952 and that he didn't expect any money for signing these deeds because "I hadn't paid anything for them, no * * * I didn't think I was supposed to be paid."

The city collector's deeds in 1948 were not given him to record and he didn't pay the recording fee. The city kept the original collector's deeds and he got them later on; his attorney obtained them for him. He hadn't at any time claimed the 13 lots, in question here, which were included in the said deed to Glaser, because he didn't know they were sold to Glaser; that not only did he never make any claim to these lots, but he never went to the collector's office to pay any taxes on them. He further testified that he had never at any time of his own volition signaled to buy these lots; and that he acted at Mrs. Wilson's direction. He could not tell the court when

he first figured out the theory that he had some interest in these lots, but he said he knew that the lots had been in his name.

■ The cause being one at law and having been tried to the court without the aid of a jury, we shall review it upon both the law and the evidence as in suits of an equitable nature. In such cases we are further directed by statute, Section 510.310 RSMo 1949, V.A.M.S., that "the judgment shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

■ Appellant contends that the court erred in overruling intervenor's motion to strike a portion of the answer filed by plaintiffs to the intervening petition on the ground that the "portion sought to be stricken constitutes no defense to intervenor's petition." Included in the portion sought to be stricken was an allegation that intervenor was only a "straw party" for the City of Berkeley; that, prior to the said tax sales intervenor had an agreement with certain city officials that he would purchase the lots with others on behalf of the said city and that he did not purchase on his own behalf. Intervenor included with the portion sought to be stricken a portion of the answer which alleged that intervenor "claiming no interest in said lots, executed a quit claim deed to one Vernette A. Glaser dated January 22, 1952 * * * that the plaintiffs thereafter acquired title to the real estate involved herein from the said Vernette A. Glaser." Clearly, this portion of the answer included in the portion sought to be stricken, constituted a valid defense to intervenor's petition wherein he claimed title to the described real estate. The court did not err in overruling the motion to strike. See Jones v. Murray, 167 Mo. 25, 66 S.W. 981, 988; Wertheimer-Swarts Shoe Co. v. McDonald, 138 Mo. App. 328, 122 S.W. 5, 8.

Appellant further contends that the pleadings and evidence are insufficient to support the judgment quieting title in plaintiffs; and that the court erred in not entering judgment for intervenor. Appellant seeks to support these contentions on various grounds, some of which are mere abstract statements with no attempt to apply them to the facts of this case. For example, appellant states: "The 'Third Sale Collector's Deeds' (Plaintiffs' Exhibits 'P' and 'Q') vest in the grantee Steve LaJeunesse (the intervenor) 'An Absolute Estate in Fee Simple.' Section 140.420 RSMo 1949 [V.A.M.S.]. Said 'Collector's Deeds' are Warranty Deeds. The granting clause 'Grant, Bargain and Sell' is a warranty. Section 442.420 RSMo 1949 [V.A.M.S.]. * * * 'The Collector's Deeds' (Plaintiffs' Exhibits 'P' and 'Q') are not subject to a collateral attack and are not available as a defense to the intervenor's petition."

As we read this record, we find no attack, direct or collateral upon the "Third Sale Collector's Deeds" to the intervenor. On the pleadings and admitted facts and on the theories of both parties, title in fee vested in the grantee (intervenor) by reason of the mentioned deeds and it is immaterial to any of the issues herein whether he acquired title as a "straw party" for others, or for his own personal benefit. The results are the same in either event. He did get legal title.

Appellant further says, "Neither the plaintiff nor his immediate grantor in Plaintiff's Exhibit 'L' (the quit claim deed of January 21, 1952) were at any time prior to said tax sale, owners of any of the realty involved in this action and at no time had any equity of redemption from said tax sale and certainly had no action at any time in equity within the three year period after the recording of the 'Collector's Deeds' or thereafter, to attack said deeds." Again, we may assume that appellant is entirely correct in this position, but it is not pointed out how this fact is material to any of the issues here presented. Plaintiffs do not claim any ownership prior to the tax sales and have claimed no right of redemption.

Appellant further states: "All Counties in the State of Missouri and the City of St. Louis (as a County entity), have the power and may purchase real estate at a tax sale and take title in the name of a 'Trustee'. No Cities as such have that power, and any attempt for such action by any city is ultra vires."

There is no contention here that the city ever acquired legal title to the described property. The City of Berkeley is not a party to this action. Plaintiffs do not claim title from the city except in the same manner that intervenor claims title, to wit, through the foreclosure and sale under tax liens to intervenor, regardless of the capacity in which intervenor took and held the said title.

.Appellant further says, "All statements and agreements made prior to the execution of a deed to convey real estate are merged in the deed and all evidence relating to any prior statements or agreements is incompetent and prejudicial." This rule of law is not questioned by respondent, but appellant's contention is not in any manner related to the record on appeal. There is no assignment that any specified evidence was improperly admitted and there is no reference to the transcript where any such evidence may be found. Supreme Court Rule 1.08. The facts and circumstances concerning the execution and delivery of the several deeds only sustain and do not contradict or impeach the deeds as conveyances.

Appellant further states: "The uncontradicted evidence of the intervenor is to the effect that he at no time had any intention to transfer the title to the realty in dispute by Plaintiffs' Exhibit 'L' (the quit claim deed of January 21, 1952) and said exhibit is therefore invalid for failure of delivery."

Most of the essential facts in this case are not in dispute and are not disputed by either appellant or respondent. The most decisive facts are admitted by intervenor. One material issue in dispute on the oral testimony is whether intervenor and his wife had signed the quit claim deed to Mrs. Glaser in blank and whether it had been subsequently, filled out or whether it had been fully written before it was signed by intervenor and his wife, as testified to by Mrs. Wilson. The trial court made no specific finding on this issue, but the statute, Sec. 510.310, supra, provides that, in cases tried by the court, "All fact issues upon which no specific findings are made shall be deemed found in accordance with the result reached." The finding on this issue turned upon the credibility of the witnesses (Intervenor and Mrs. Wilson) and in such case we should, and do, defer to the trial court's finding.

The deed in question is in the regular form of a quit claim deed, the consideration is stated to be one dollar ($1.00) and other valuable considerations, the signatures on the deed are admitted and the deed purports to have been acknowledged on January 21, 1952, before Mrs. Dorothy Wilson, a notary public, and a seal is shown. The evidence in the record fully supports a finding that this deed was voluntarily executed by intervenor and his wife with the intention that it be delivered by the city clerk to the grantee named therein; and that it was so delivered and, later recorded in the land records of the county. The absence of any intention on the part of intervenor "to transfer the title to the realty in dispute" by the quit claim deed to Mrs. Glaser, in view of the admitted action and conduct of the intervenor on prior occasions and his proven conduct on this occasion cannot control on the issue as to whether the deed was sufficient to pass title to the grantee. We hold that it was sufficient and that title passed to the grantee by the deed.

Appellant's final point, under points and authorities, is that "The plaintiffs and his predecessor in the alleged title, had actual and constructive notice of the claim of the intervenor to the title of the realty and certainly were not purchasers without notice, having accepted quit claim deeds."

The record in this case tends to show that at the time the plaintiffs acquired their title there was nothing of record tending to show that intervenor had any interest in the described real estate; there is no evidence that prior to purchase, plaintiffs had any knowledge of intervenor's present claim. He was not made a party to the original quiet title suit, apparently, because the record discloses no defect of title with reference to him. So far as the public records were concerned he had, in due form, made a valid conveyance of his interest in the property. There was nothing of record indicating that he was a "straw party" or otherwise, and nothing to put a purchaser on notice of any adverse claim by intervenor.

As we read intervernor's testimony, his real contention is that he purchased the property at the direction of the city clerk and, while he paid nothing for it and had made no claim to it or paid any taxes on it, he had only agreed to execute quit claim deeds for delivery to prior owners of the property who sought to redeem the property from tax sale by payment to the city of all unpaid delinquent taxes, penalties, interest and costs; and that, when he signed the Glaser deed, he didn't know it evidenced a sale by the city to a purchaser, and was not a redemption by a prior owner on payment to the city the amount of the city's tax interest in the property. This matter was purely one between intervenor and the city, it did not appear of record; and if intervenor overlooked it or failed to attend to it at the time he signed the deed for delivery, it was waived. In any event, it was not disclosed by the record, or to the purchaser.

We find that the deed, regular on its face, was voluntarily executed by intervenor for the purpose of delivery, and with the intention of releasing all of intervenor's interest in the property. The deed was sufficient to transfer title to the grantee irrespective of whether the grantee was a purchaser or was thought to be a prior owner redeeming the property. It was further immaterial whether intervenor received any consideration for the deed. It recited a consideration and was a valid voluntary conveyance. Schneider v. Johnson, 357 Mo. 245, 207 S.W.2d 461, 467; Meyer v. Schaub, 364 Mo. 711, 266 S.W.2d 620, 624(6). The deed was sufficient to bar any present claim by intervenor-appellant. Rubinstein v. Rubinstein, Mo.Sup., 283 S.W.2d 603, 607.

The judgment is affirmed.

All concur.